**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **SIERRA CLUB,**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF<br>ENERGY, et al.,**<br><br>**Defendants.** | **Civil Action No. 11-514 (JDB)** |

**<u>MEMORANDUM OPINION</u>**

Defendant-intervenor Mississippi Power Company is currently constructing a coal power

plant in Kemper County, Mississippi.  Defendant United States Department of Energy is

providing funding assistance for the construction and operation of the plant.  Before granting the

funding, the Department issued an Environmental Impact Statement ("EIS") evaluating the

funding's environmental effects, as required by the National Environmental Policy Act

("NEPA").  Plaintiff Sierra Club is challenging the funding on the ground that the EIS was

legally insufficient.  The Sierra Club asserts claims against DOE, the Secretary of Energy, DOE's

Director of NEPA Policy and Compliance, and DOE's NEPA Document Manager.

Now before the Court is the Sierra Club's motion for a preliminary injunction.  Also

before the Court is the federal defendants' motion to dismiss some of the Sierra Club's claims.

For the reasons set out below, the Court will deny the Sierra Club's motion for a preliminary

injunction and grant the federal defendants' motion to dismiss.  The case shall proceed only on

the Sierra Club's remaining claims.

I. Background

The Energy Policy Act of 2005 created the Clean Coal Power Initiative ("CCPI").  See 42 U.S.C. §§ 15961-65.  Under the CCPI program, the Secretary of Energy is authorized to provide financial assistance to projects that meet certain criteria.  Id. § 15962(d).  To receive such assistance, projects must generally advance efficiency, environmental performance, and cost competitiveness well beyond the level of technologies that are in commercial service or have been demonstrated on a scale of viable commercial service.  Id. § 15962(a).  Furthermore, the Energy Policy Act of 2005 also created a loan guarantee program to provide incentives for innovative technologies.  See id. §§ 16511-16.  The Secretary of Energy is authorized to make loan guarantees for projects that avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases and employ new or significantly improved technologies as compared to commercial technologies currently in service.  Id. § 16513(a).  DOE may issue a loan guarantee for a maximum of 80% of project costs.  Id. § 16512(c).

NEPA requires federal agencies to prepare a detailed statement of environmental impact for "major Federal actions significantly affecting the quality of the human environment."  Id. § 4332(C); see Found. on Econ. Trends v. Heckler, 756 F.2d 143, 146-47 (D.C. Cir. 1985).  Therefore, the Department must prepare an EIS before providing CCPI financial assistance or a loan guarantee if doing so constitutes "major Federal action."

The Kemper project will be a coal power plant located on approximately 1,650 acres of land in Kemper County, Mississippi.  Record of Decision and Floodplain Statement of Findings, 75 Fed. Reg. 51,248, 51,250 (Aug. 19, 2010).  At full capacity, the plant will convert an average of 13,800 tons of coal into gas per day.  Id.  Mississippi Power has also acquired, optioned, or identified for acquisition approximately 1,400 acres of "buffer areas" immediately adjacent to the

project site.  Id.  In addition to this area, the project will affect additional acreage by requiring

the construction and operation of a cooling water supply pipe, a natural gas pipeline, associated

transmission lines and substations, carbon dioxide pipelines, and a lignite mine.  Id.

The Kemper project is projected to cost a total of more than $2 billion.  See Notice of

Intent and Notice of Proposed Floodplain and Wetlands Involvement, 73 Fed. Reg. 54,569,

54,570 (Sept. 22, 2008).  In September 2008, DOE announced that the Kemper project was under

consideration for $294 million in CCPI financial assistance as well as a loan guarantee and that

the Department of Energy was preparing an EIS assessing the potential environmental impact

associated with the construction and operation of the project.  Id. at 54,569-70.  Prior to the

completion of the NEPA process, DOE disbursed approximately $24 million of the $294 million

total for "preliminary design and project definition."  Id.  at 54,570.  In May 2010, DOE issued

the final EIS.  75 Fed. Reg. at 51,249.

Construction on the Kemper project began in June 2010.  Def.-intervenor's Resp. in

Opp'n to Pl.'s Mot. for a Prelim. Inj. [Docket Entry 20] ("Def.-int.'s Resp.") at 10.  On August 19,

2010, DOE issued a Record of Decision awarding Mississippi Power the remaining $270 million

in CCPI financial assistance.  75 Fed. Reg. at 51,249.  Although the May 2010 EIS addressed

both the CCPI financial assistance and a loan guarantee, the Record of Decision issued in August

2010 governed only CCPI financial assistance; DOE stated that "[a] separate decision would be

made regarding the loan guarantee" to be announced "in a subsequent Record of Decision."  Id.

The Sierra Club's complaint presents five causes of action.  First, the Sierra Club alleges

that DOE violated NEPA by selecting the Kemper project for CCPI funding without giving

detailed consideration to alternatives other than building the plant proposed by Mississippi

Power.  Compl. ¶¶ 46-49.  Second, the Sierra Club alleges that DOE violated NEPA by selecting

the Kemper project for a loan guarantee without giving detailed consideration to alternatives. Compl. ¶¶ 50-53.  Third, the Sierra Club alleges that DOE violated NEPA by preparing the EIS with a specified "purpose and need" that was too narrow.  Compl. ¶¶ 54-58.  Fourth, the Sierra Club alleges that DOE violated NEPA by neglecting to consider the cumulative impact of emissions from the Kemper project in combination with emissions from other coal plants. Compl. ¶¶ 59-62.  Fifth, the Sierra Club alleges that DOE violated NEPA by failing to disclose all the environmental impacts of the Kemper project and failing to identify mitigation measures. Compl. ¶¶ 63-64.

The Sierra Club asserts that it has standing to sue on behalf of members of its organization that live in the immediate vicinity of the Kemper plant.  It has submitted declarations from those members and maintains that ongoing construction activities have overtaken and will continue to disrupt a "once quiet and peaceful community."  See Pl.'s Mem. of Law in Supp. of its Mot. for a Prelim. Inj. [Docket Entry 11-1] ("Pl.'s PI Mem.") at 32-33. Furthermore, the Sierra Club maintains that the completed plant will emit thousands of tons of air pollution and greenhouse gases.  Id. at 33.  It contends that, as a result of the plant's construction and operation, land will be permanently damaged, members' property will be devalued, and members will suffer increased risks of adverse health effects.  Id.

II.  Sierra Club's Motion for a Preliminary Injunction

The Sierra Club's motion for a preliminary injunction argues that, absent an injunction, construction of the Kemper project will go forward without meaningful environmental analysis and the plant may be nearly complete before the Court issues a final ruling.  Id. at 2.  The Sierra Club therefore moves for a preliminary injunction prohibiting DOE from disbursing any further

federal funds in connection with the Kemper project and prohibiting DOE from issuing any loan guarantee for the project, pending a decision on the merits.  Id.

a.  Preliminary Injunction Standard

To prevail on a motion for a temporary restraining order or preliminary injunction, the moving party must demonstrate:  (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the relief were not granted; (3) that the relief would not substantially injure other interested parties; and (4) that the public interest would be furthered by the relief.  See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (citing Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); see also Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008).

The parties disagree as to whether the Court should use a "sliding scale" to evaluate these four factors or whether, instead, each factor is a prerequisite to be considered independently.  See Pl.'s PI Mem. at 19; Def.'s Resp. in Opp'n to Pl.'s Mot. for a Prelim. Inj. [Docket Entry 19] ("Def.'s Resp.") at 8-9; Def.-int.'s Resp. at 16.  The four factors have "typically" been evaluated on a "sliding scale," whereby "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).  But recent Supreme Court precedent has called this model into question.  See Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011).  With respect to irreparable harm, it is now clear that a showing of irreparable injury is an independent prerequisite for a preliminary injunction. See Chaplaincy, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); see also Winter, 555 U.S. at 22.  However, it is somewhat less clear that

likelihood of success on the merits is similarly an independent prerequisite for a preliminary injunction.  In a concurrence, two judges of the DC Circuit have stated that this is so.  See Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("[A] likelihood of success is an independent, free-standing requirement for a preliminary injunction.").  Nonetheless, the DC Circuit has not resolved the question in its most recent treatment of the issue.  See Sherley, 644 F.3d at 393.

This case law is relevant here because the Sierra Club, as explained below, has failed to make a clear showing of a substantial likelihood of success on the merits.  This finding may well make consideration of irreparable harm unnecessary.  In an abundance of caution, however, and following Sherley, the Court will also consider irreparable harm.  Ultimately, the Court finds that regardless of whether the need to show a likelihood of success on the merits is treated as an independent prerequisite or is considered in conjunction with irreparable harm, the Sierra Club's showing is too weak to warrant the grant of a preliminary injunction here.

b.  Likelihood of Success on the Merits

DOE and Mississippi Power contend that the Sierra Club is unlikely to succeed on the merits because it lacks standing to bring suit.  Before this Court may entertain the merits of its claims, the Sierra Club, as the party invoking federal jurisdiction, must demonstrate that it has the requisite standing to sue.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact" which is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." Id. (internal quotation marks and citations omitted).

The standing issue is presented here because the Sierra Club challenges DOE's decision, but the harm to its members results from the actions of Mississippi Power.  That is, the Sierra Club challenges DOE's decision to award funding to the Kemper project, but the harm springs from Mississippi Power's construction and operation of the plant.  Mississippi Power is therefore a "third party" to the dispute between the Sierra Club and the Department.  Hence, the Sierra Club's motion for a preliminary junction barring DOE from funding the project raises issues of causation and redressability.

Causation and redressability assure that the proper parties have brought their dispute to the proper branch of the federal government.  Fla. Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  Causation "examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff."  Id. (internal citations omitted).  By contrast, "[r]edressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  Id. at 663-664 (internal citations and footnote omitted).

 "[A] federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41 (1976).  As stated in Florida Audubon, "[t]he Supreme Court itself has noted the improbability of establishing the necessary likelihood of some result when that result depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation."  94 F.3d at 670 (citing Simon, 426 U.S. at 42-46).  To prevail under such circumstances, the plaintiff must show a "causal link" between the agency's decision and the third party's action; a "'significant

increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury

suffered' will suffice for standing." Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1, 6-7

(D.C. Cir. 2005) (quoting Utah v. Evans, 536 U.S. 452, 464 (2002)). Specifically, when a third

party "is prepared to obtain funding from other sources if federal money is unavailable," the

plaintiff lacks standing due to a lack of redressability. St. John's United Church of Christ v.

FAA, 520 F.3d 460, 463 (D.C. Cir. 2008).

"The party invoking federal jurisdiction bears the burden of establishing these elements

[of standing].  Since they are not mere pleading requirements but rather an indispensable part of

the plaintiff's case, each element must be supported in the same way as any other matter on

which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence

required at the successive stages of litigation." Lujan, 504 U.S. at 56; see also Bennett v. Spear,

520 U.S. 154, 167-68 (1997).  The preliminary injunction is "an extraordinary remedy that

should be granted only when the party seeking the relief, by a clear showing, carries the burden

of persuasion." Chaplaincy, 454 F.3d at 297 (quoting Cobell v. Norton, 391 F.3d 251, 258

(D.C.Cir. 2004)); see also Munaf v. Geren, 553 U.S. 674, 689-90 (2008).  In Mazurek v.

Armstrong, 520 U.S. 969 (1997), the Supreme Court reversed a lower court's grant of a

preliminary injunction because the plaintiff failed to show a likelihood of success on the merits.

In explaining how courts should assess such a situation, the Court observed that "the requirement

for substantial proof is much higher" for a preliminary injunction than in a motion for summary

judgment and emphasized the need for the plaintiff to make "a clear showing" of likelihood of

success in order for a preliminary injunction to be granted.  Id. at 1867.

As is often the case, here the posture of the burden determines the outcome of the issue.

The Sierra Club has not met its burden of showing that the harm to its members would be

redressed by the injunction it seeks.  That failure in turn undermines its likelihood of success on the merits of its claim.

There is some evidence that Mississippi Power would not have gone forward with the Kemper project had DOE not initially provided funding.  The Department's EIS specifically stated that the Kemper project was "unlikely" to proceed "[i]n the absence of [CCPI] assistance and loan guarantee[s] . . . given the cost and financial risk associated with such a large-scale demonstration project."  Kemper Cnty. Integrated Gasification Combined-Cycle (IGCC) Project, Final Envtl. Impact Statement (May 2010), Administrative Record at DOE002109-10; see Pl.'s Reply in Further Supp. of its Mot. for a Prelim. Inj. ("Pl.'s PI Reply") at 3-4.  Mississippi Power disputes this characterization, at least with respect to CCPI assistance, arguing that it "decided to seek cost-shared CCPI funding from DOE only after the Company had already identified the IGCC project in Kemper County as its next generation project."  Def.-int.'s Resp. at 2.  The Sierra Club also notes that the CCPI and loan guarantee programs are specifically intended to target projects that would have difficulty proceeding without federal support.  Pl.'s PI Reply at 4.

It is largely irrelevant, however, what Mississippi Power would or would not have done had DOE not made its initial decision to fund the project.  With respect to injunctive relief, the relevant question is what effect an order from this Court would have now.  An injunction must remedy present harm, not prior injuries.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998) ("Because respondent alleges only past infractions . . . and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); see also NRDC v. Pena, 147 F.3d 1012, 1021-22 (D.C. Cir. 1998).

 Hence, if Mississippi Power would go forward with the project at this time regardless of whether an injunction is ordered, then an injunction would not redress Sierra Club members'

injuries.  On this point, Mississippi Power has presented the sworn affidavit of the corporate official with primary responsibility for the development and construction of the Kemper project. See Def.-int.'s Resp., Decl. of Thomas O. Anderson ¶ 1.  This official has declared in no uncertain terms that, "[g]iven the advanced stage of development of the Kemper Project," Mississippi Power "would continue to construct the Kemper Project even if the DOE is enjoined temporarily or permanently from disbursing any additional CCPI-2 funds and/or approving DOE loan guarantees to MPC." Id. ¶ 16.  This evidence stands unrebutted in the record.

In response, the Sierra Club argues that "construction of the [Kemper] plant is unlikely to move forward without federal support." Pl.'s PI Reply at 4.  The Sierra Club contends that enjoining CCPI funding would impact the project's cash flow and make it more difficult for Mississippi Power to obtain financing.  See Pl.'s PI Reply at 5-6.  Furthermore, the Sierra Club states that "if the issuance of loan guarantees is enjoined, Mississippi Power is unlikely to obtain overall financing for this $2.67 billion project, much less bridge financing that would be needed to continue near term construction activities in the absence of CCPI funds." Id. at 6.  The Sierra Club maintains that "Mississippi Power and the government have failed to present any evidence that Mississippi Power will be able to obtain financing in the event that federal funding and the issuance of loan guarantees are enjoined." Id. at 6-7.  It also notes that Mississippi Power concedes that actually stopping construction, even temporarily, would, in fact, cause the termination of the project. Id. at 4.

The Sierra Club is certainly correct that enjoining either the CCPI financial assistance or prospective loan guarantees would disrupt the current financing of the Kemper project and ultimately make the project more expensive.  But the Sierra Club has not provided any evidence that such an action would imperil the project.  Mississippi Power's statement that an actual work

stoppage would end the project is not the same as saying that cutting off federal support would do so.  By contrast, Mississippi Power has provided a sworn affidavit from the official responsible for the project indicating that the project would, in fact, go forward now even without federal backing.  The Sierra Club's protestation that this statement is not supported by "evidence" gets the burden backwards; it is the Sierra Club, not the defendants, that must make the showing at the preliminary injunction stage.   The Sierra Club has therefore failed to show a likelihood that an injunction enjoining the federal support would redress their members' injuries.  Cf. St. John's United, 520 F.3d at 463 ("[V]acating the grant condition would not redress the petitioners' injuries because [the third party] is committed to completing the project anyway.").

The Sierra Club has cited two instances in which a plaintiff had standing to challenge an agency's decision when injury was caused by a third party rather than the agency's decision itself.  In Bennett v. Spear, those receiving water from an irrigation project had standing to challenge a biological opinion issued by the Fish and Wildlife Service, even though the Bureau of Reclamation, rather than the Service itself, actually administered the project.  See 520 U.S. at 155-59.  Similarly, in National Parks Conservation Ass'n v. Manson, organizations whose members used two federal land areas had standing to challenge an environmental determination by the Department of Interior, even though a state agency, rather than Interior, issued the permit actually authorizing the project.  See 414 F.3d at 5-7.  In both these cases, however, reversing the agency's decision had a more significant effect on the third party's action than in the case here.  In Bennett, the Court explained that while "it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." 520 U.S. at 169 (internal quotation marks and citations omitted).  Likewise, in National Parks the court

concluded that the third party there was "not the sort of truly independent actor who could destroy the causation required for standing." 414 F.3d at 6.  But here it has not been shown that Mississippi Power's action is similarly so dependent on DOE's continued funding.  Hence, the Court finds that the Sierra Club has failed to show a likelihood of success on the merits of its claims, because its standing to bring suit is doubtful.

c.  Irreparable Harm

As noted above, the Court may not need to consider irreparable harm, because the Sierra Club has failed to show a likelihood of success on the merits.  In an abundance of caution, however, the Court will also consider the irreparable harm prong of the test.  With respect to irreparable harm, defendants present a similar argument as to likelihood of success on the merits: the Sierra Club has not shown its members will be irreparably harmed without an injunction because an injunction will not remedy Sierra Club members' injuries.  See Def.'s Resp. at 23-26; Def.-int.'s Resp. at 15-23.  The Sierra Club, of course, contends that the project is unlikely to go forward without federal support.

As with the likelihood of success on the merits prong, a plaintiff bears the burden of showing that it will suffer irreparable injury.  The Supreme Court has conclusively rejected the idea that a plaintiff bears a lower burden of proof for irreparable harm, even when "plaintiff demonstrates a strong likelihood of prevailing on the merits."  See Winter, 555 U.S. at 21. Rather, a plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction."  Id. at 22.  Here, the Sierra Club has not done so.

It is difficult to dispute that Sierra Club members might be irreparably harmed by the construction and operation of the Kemper plant.  It is also true that the project appears likely to continue without an injunction that halts federal funding.  It is not quite accurate, then, that the

Sierra Club has failed to show it will suffer irreparable harm in the absence of preliminary relief. That the Sierra Club may be harmed by the Kemper project, however, is not the same as saying it will be harmed by the federal funding, which is what it seeks to enjoin.  Though the Sierra Club may be harmed if the Court does not issue an injunction regarding federal funds, it may be harmed even if the Court does issue an injunction regarding federal funding.  That is, the project may well proceed with or without the relief the Sierra Club seeks.

It would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm.  A plaintiff may be irreparably harmed by all sorts of things, but the irreparable harm considered by the court must be caused by the conduct in dispute and remedied by the relief sought.  As a judge of this district recently and persuasively concluded: "Because an injunction will not redress its alleged injuries, [plaintiff's] claim that it will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best."  Navistar, Inc. v. EPA, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011); see also Faulkner v. Jones, 10 F.3d 226, 236 (4th Cir. 1993) (Hamilton, J., dissenting) ("If the relief requested does little, if anything, to alleviate the alleged injuries, it is difficult to comprehend how the refusal to grant that relief could cause irreparable harm."); Seto v. Thielen, 2010 WL 2612603, at *3 (D. Haw. June 28, 2010) (same); cf. NRDC v. Pena, 147 F.3d at 1021 (equating argument that injunction would not redress plaintiffs' claim with failure to show "injury in fact"). Rather than asking whether the plaintiff will suffer irreparable injury "without" injunctive relief, then, it is perhaps more accurate to phrase the question, as some courts have, as whether the plaintiff will suffer irreparable harm "but for" the issuance of an injunction.  See, e.g., Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).  The inquiry must be whether the plaintiff has shown that the relief sought will actually prevent irreparable harm.

As noted above, Mississippi Power has provided a sworn affidavit indicating that it will proceed with the Kemper project with or without CCPI assistance or a loan guarantee. The Sierra Club has produced evidence that the project was unlikely to have commenced without federal funding, but has not made such a showing regarding the continued viability of the project without federal funding. Hence, the Sierra Club has failed to meet its burden of showing that it will be irreparably harmed by DOE's funding of the Kemper Project absent the injunction it seeks.

d. Conclusion

The Sierra Club has failed to meet its burden of showing a likelihood of success on the merits. While this alone may be sufficient grounds for denying a preliminary injunction, the Court has also considered irreparable harm and found the Sierra Club's showing lacking with respect to that prong as well. Accordingly, Sierra Club's motion for a preliminary injunction will be denied.

III. DOE's Motion to Dismiss

The federal defendants have moved to dismiss the Sierra Club's suit with respect to the issuance of a federal loan guarantee. The Department argues that it has not taken final agency action with respect to a loan guarantee for the Kemper project and, similarly, that the Sierra Club's challenge to a loan guarantee is not ripe. Def.'s Mot. to Dismiss [Docket Entry 12], at 1. The Department therefore moves to dismiss the Sierra Club's second claim, which pertains entirely to loan guarantees, and the third, fourth, and fifth claims in so far as they pertain to loan guarantees.

a. Motion to Dismiss Standard

Dismissal on the ground of no final agency action is properly sought under Rule 12(b)(6).

Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 18 n.4 (D.C. Cir. 2006).

The issue of ripeness falls under Rule 12(b)(1). See Venetian Casino Resort, L.L.C. v. EEOC,

409 F.3d 359, 363-64 (D.C. Cir. 2005). In either case, "in passing on a motion to dismiss,

whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause

of action, the allegations of the complaint should be construed favorably to the pleader."

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cnty. Narcotics and

Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979). In other words, the factual allegations in the plaintiff's complaint must be

presumed true, and the plaintiff must be given every favorable inference that may be drawn from

the allegations of fact. Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d

1111, 1113 (D.C. Cir. 2000). At the same time, however, the Court need not accept as true "a

legal conclusion couched as a factual allegation," nor need it accept inferences that are

unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C.

Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

b.  Ripeness

The Court begins with the Department's ripeness argument because D.C. Circuit

precedent more directly addresses the current situation — a NEPA challenge to the adequacy of

an EIS — through the ripeness lens.  "A claim is not ripe for adjudication if it rests upon

'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"

Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric.

Prods. Co., 473 U.S. 568, 580-581 (1985)). To decide whether an agency's decision is ripe for

judicial review, courts must consider:  (1) whether delayed review would cause hardship to the

plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732 (1998). "Like the standing doctrine, the ripeness requirement dictates that courts go beyond constitutional minima and take into account prudential concerns which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of our jurisdiction." Wyo. Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 48 (D.C. Cir. 1999).  "The 'primary focus' of the prudential aspect of the ripeness doctrine is to balance 'the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" Id. at 49 (quoting Eagle-Picher Indus. v. EPA, 759 F.2d 905, 915 (D.C. Cir. 1985)).

The D.C. Circuit has concluded that NEPA challenges are not ripe for review until agency decision-making has "reached that 'critical stage' where an 'irreversible and irretrievable commitment of resources' has occurred that will adversely affect the environment." Ctr. for Biological Diversity v. Dep't of Interior, 563 F.3d 466, 480 (D.C. Cir. 2009) (quoting Wyo. Outdoor Council, 165 F.3d at 49).  Thus, the court held that a NEPA claim was not ripe when the Forest Service had authorized oil and gas leasing on certain lands, but had not yet actually issued any leases.  Wyo. Outdoor Council, 165 F.3d at 49-50.  Likewise, the court concluded that a NEPA challenge to an offshore oil and gas development program was not ripe when the agency had approved the overall program but not specific lease-sales.  Ctr. for Biological Diversity, 563 F.3d at 480.  Furthermore, the court dismissed a NEPA challenge to a DOE interim transportation plan when that plan "d[id] not represent [DOE's] final determination regarding the

plan," noting that "[a]ny injury to [plaintiff] will not occur until the DOE makes a concrete decision." Nevada v. Dep't of Energy, 457 F.3d 78, 84-86 (D.C. Cir. 2006).

DOE contends that Sierra Club's loan guarantee claims are not ripe because, while the EIS addressed a loan guarantee as well as CCPI assistance, the Department has not yet issued a Record of Decision about a guarantee (as it did with respect to CCPI funding). DOE contends that the Sierra Club "cannot suffer any hardship from delaying review of a potential loan guarantee that may or may not be provided at some point in the future." Def.'s Mot. to Dismiss at 10.

The Sierra Club responds, first, that it will suffer hardship from delayed consideration of loan guarantees because once lending obligations are issued in reliance on a guarantee, it will be harder to retract the guarantee. Pl.'s Mem. of Law in Opposition to Def.'s Mot. to Dismiss [Docket Entry 18] ("Pl.'s Opp. Mem.") at 9. Moreover, "[t]he longer judicial review is delayed, the more predisposed to issue loan guarantees DOE will be." Id. Second, the Sierra Club argues that immediate consideration of loan guarantees would not interfere with administrative action because "the only administrative actions identified by the government that remain are DOE's completion of its due diligence process for the loan guarantee, its negotiation of financing and other legal documents for a loan guarantee, and its decision of whether to issue a loan guarantee." Id. Third, the Sierra Club contends that waiting to consider loan guarantees will not result in any further factual development of the issues. Id. at 10. It contends that Center for Biological Diversity and Nevada are distinguishable because more significant additional agency action was expected there, making further environmental analysis likely, whereas in this case the "final" EIS already addressed a loan guarantee. Id. at 9-12. The Sierra Club also notes that DOE has already committed resources to the Kemper project (in the form of CCPI assistance) and

argues that DOE has had a "long-standing objective of backing Mississippi Power's project."   Id.
at 11.

Sierra Club's arguments are unavailing because the Department has not yet made an
"irreversible and irretrievable commitment of resources" with respect to loan guarantees.  Until
the Department issues a Record of Decision on a guarantee, it is not committed to making one.
The Sierra Club may be correct that the Department is closer to making a decision than the
agencies were in Wyoming, Center for Biological Diversity, or Nevada.  But so long as the
Department has not yet actually made a decision, its progress is still unripe for adjudication
under the test articulated in those cases — the "irreversible and irretrievable commitment of
resources."  Until DOE actually commits to a loan guarantee, it is not relevant that DOE has
committed other resources to the Kemper project or that DOE seems to the Sierra Club to have
made up its mind.  Furthermore, it is not clear that there will be no further development of the
issues here.  Although the EIS did discuss a loan guarantee and was entitled "final," the EIS does
not itself commit resources, and the agency could very well undertake further analysis
(environmental or otherwise) before actually committing resources or deciding not to commit
resources.  Finally, it is not relevant that deferred review might make the agency more likely to
continue on its course of action or make the ultimate decision harder to undo, since that is true in
virtually every situation in which courts defer review on ripeness grounds.

c.  Final Agency Action

The Department, in the alternative, also challenges Sierra Club's loan guarantee claims on
the grounds that DOE has not undertaken "final agency action" with respect to a loan guarantee.
"[B]ecause NEPA creates no private right of action, challenges to agency compliance with the
statute must be brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq.,

18

which requires 'final agency action for which there is no other adequate remedy in court,' id. § 704." Karst Envtl. Educ. and Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). "'Finality resulting from the practical effect of an ostensibly non-binding agency proclamation is a concept we have recognized in the past,' but 'if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.'" Vill. of Bensenville v. FAA, 457 F.3d 52, 69 (D.C. Cir. 2006) (quoting Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005)); see also Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 197 (D.C. Cir. 2003) ("To seek review under the APA [plaintiff] must allege the [agency] is 'irretrievably committed' to providing funds . . . .") (quoting Macht v. Skinner, 916 F.2d 13, 17 (D.C. Cir 2003)).

The Department maintains that it has not taken final agency action with respect to a loan guarantee because "the Loan Programs Office is still considering Mississippi Power Company's loan guarantee application." Def.'s Mot. to Dismiss at 7. The Sierra Club responds by arguing that a final EIS is itself "final agency action." Pl.'s Opp. Mem. at 5. The Sierra Club argues that Karst and Coalition for Underground Expansion addressed more minor action that did not require an EIS, whereas here it is not in dispute that a substantial loan guarantee requires an EIS. Pl.'s Opp. Mem. at 5-7.

The Sierra Club is correct that the reviewability of an EIS was not at issue in the cited "final agency action" cases. As noted above, the reviewability of an EIS has primarily been viewed as a question of ripeness. Even so, the cited cases articulate a test for determining whether an agency's decision is "final agency action," and that test is essentially the same as for determining whether an agency action is "ripe" for judicial consideration: for a decision to be reviewed, resources must have been "irretrievably committed." Here, DOE has not taken that final step of deciding whether to approve the loan guarantee, and hence DOE's action has not created legal consequences regarding a loan guarantee, either technically or as a practical matter. Regardless of whatever steps have been taken thus far, DOE can change its mind (or, more precisely, has not yet made up its mind) until it issues a Record of Decision. Mississippi Power is currently constructing the Kemper project without the benefit of a federal loan guarantee. The EIS is therefore not final agency action with respect to a loan guarantee.

d.  Conclusion

The Department's anticipated loan guarantee for the Kemper project is not ripe for judicial review or, in the alternative, is not "final agency action" reviewable under the Administrative Procedures Act. Accordingly, the Sierra Club's second claim will be dismissed in its entirety and its third, fourth, and fifth claims will be dismissed so far as they pertain to loan guarantees. The case shall proceed at this time only on the Sierra Club's remaining claims.

IV.  Conclusion

For the reasons explained above, the Sierra Club's motion for a preliminary injunction will be denied and the federal defendants' motion to dismiss the Sierra Club's claims with respect to loan guarantees will be granted. A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   November 18, 2011